AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

2/23/23

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.
THE CELLULAR TELEPHONE ASSIGNED CALL )   3:23-mj-62
NUMBER (404) 386-7603 )
)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Southern _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C., §§ 841(a)(1) and 846 | Possession with intent to distribute a controlled substance, distribution of a controlled substance, and conspiracy to distribute the same. |

The application is based on these facts:

See attached affidavit.

To ensure technical compliance with 18 U.S.C. 3121-3127, the requested warrant will also function as a pen register. I thus certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the FBI. See 18 U.S.C. 3122(b) and 3123(b). */s AUSA Kelly K. Rossi*

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Rebecca L. S. DeBord, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means).*

Date: February 23, 2023

City and state: Dayton, Ohio

_____
Caroline H. Gentry
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

1.     The cellular telephone assigned call number **(404) 386-7603** (the "**TARGET CELL PHONE**"), whose service provider is AT&T Corporation, a wireless telephone service provider headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida, 33408.

2.     Records and information associated with the **TARGET CELL PHONE** that is within the possession, custody, or control of AT&T Corporation, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

### I.  Information to be Disclosed by the Provider

All information about the location of the **TARGET CELL PHONE** described in Attachment A for a period of thirty days, during all times of day and night.  "Information about the location of the **TARGET CELL PHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T Corporation, AT&T Corporation is required to disclose the Location Information to the government.  In addition, AT&T Corporation must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T Corporation's services, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on AT&T Corporation's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate AT&T Corporation for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

**II.     Information to Be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of 21

U.S.C. §§ 841(a)(1) and 846 involving PAYNE and possibly other unidentified subject(s).

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER **(404) 386-7603** | Case No. _3:23-mj-62_____<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Rebecca L. S. DeBord, being first duly sworn, hereby depose and state as

follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application for a search warrant under Federal

Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location

of the cellular telephone assigned call number **(404) 386-7603**, (the "**TARGET CELL PHONE**"),

whose service provider is AT&T Corporation ("AT&T"), a wireless telephone service provider

headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida, 33408.  The **TARGET**

**CELL PHONE** is described herein and in Attachment A, and the location information to be seized

is described herein and in Attachment B.

2.    Because this warrant seeks the prospective collection of information, including

cell-site location information, that may fall within the statutory definitions of information collected

by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested

warrant is designed to also comply with the Pen Register Act.  *See* 18 U.S.C. §§ 3121-3127.  The

requested warrant therefore includes all the information required to be included in an order

pursuant to that statute.  *See* 18 U.S.C. § 3123(b)(1).

3.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have

been since September of 2022. I am currently assigned to the Violent Crime Squad in the

Cincinnati FBI Office. My primary duties as a Special Agent consist of investigating criminal enterprises, narcotics investigations, organized crime, and violent crimes to include unlawful possession and possession with the intent to distribute controlled substances, as well as the associated conspiracies in violation of Title 21, United States Code, Sections 841, 843, and 846. I am familiar with federal firearms laws, and investigations into possession of a firearm by a convicted felon, possessing a firearm in furtherance of a drug trafficking crime and the associated violations of Title 18, United States Code, Sections 922 and 924. As part of my standard training to become a FBI Special Agent, I have received specialized training in the means and methods by which individuals and criminal enterprises conduct their illegal activities, as well as in the use of various investigative techniques used to uncover unlawful activities. Based upon my experience and training, I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their use of code words and numbers to conduct their transactions, their use of multiple telephones to conduct their illegal activities, their methods for concealing narcotics and narcotics proceeds and their use of firearms, violence, and threats of violence to protect their criminal organization. Prior to my current assignment, I was employed for approximately seven years as a Police Officer with the Lexington Police Department in Lexington, Kentucky.

4.     I have participated in various types of electronic surveillance, including the interception of wire communications, in investigations of drug traffickers, and violent criminal enterprises. I am also familiar with, and have personally participated in, other normal methods of investigating criminal enterprises, including, but not limited to, visual surveillance, the questioning of witnesses, the use of informants, and undercover operations.

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21 U.S.C. §§ 841(a)(1) and 846 have been committed, are being committed, and will be committed by Joshua Daniel PAYNE and possible other unknown persons. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

7.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### A.  Overview of the Investigation

8.     The United States, including the FBI, is conducting a criminal investigation of Joshua Daniel PAYNE ("PAYNE")[1] and other coconspirators, both known and unknown, regarding possible violations of possession with intent to distribute controlled substances, distribution of controlled substances, and conspiracy to distribute controlled substances, in violation of Title 21, U.S.C., §§ 841(a)(1) and 846 (collectively referred to as the "Subject

---

[1] PAYNE's criminal history includes numerous state felony drug arrests and convictions resulting in terms of confinement. For example, on or about December 26, 2003, PAYNE was convicted of possession of cocaine by the State of Ohio and sentenced to three years' confinement in an Ohio prison. Most recently, in 2015, he was convicted of drug trafficking and sentenced to nine months' confinement.

Offenses"). Specifically, FBI Cincinnati, the Ohio Bureau of Criminal Investigation ("BCI"), and the Warren County Drug Task Force ("WCDTF") are investigating a Dayton area, poly-drug distribution network led by PAYNE.

9.    As described in more detail below, agents have conducted physical and electronic surveillance of PAYNE, and have conducted two controlled purchases of drugs from PAYNE. The evidence gathered from my investigation suggests that PAYNE uses the **TARGET CELL PHONE** in furtherance of his drug trafficking activities.

**B.    Law enforcement learned that PAYNE traffics drugs in the Dayton, OH area.**

10.    From January 2023 to the present, agents and officers obtained information from a Confidential Informant ("CI-1")[2] with direct knowledge of PAYNE's drug trafficking organization. CI-1 positively identified PAYNE as a Dayton-based methamphetamine and fentanyl supplier who is currently selling drugs in and around the Dayton, OH area. CI-1 told law enforcement that PAYNE uses phone number (404) 386-7603—the **TARGET CELL PHONE**.

**C.    In the past month, PAYNE sold drugs to an undercover agent on two separate occasions.**

**i.    PAYNE sold drugs to an undercover agent on February 1, 2023.**

11.    On February 1, 2023, a BCI Special Agent, acting in an undercover capacity ("UC"), purchased from PAYNE eight ounces of methamphetamine and half an ounce of fentanyl for $1,700 at the residence located at 4056 Prescott Avenue, Dayton, Ohio 45406 (hereinafter, "4056 Prescott Avenue"). The UC arranged the drug transaction by contacting

---

[2] CI-1 has provided information to officers that has proven to be reliable and truthful. CI-1 is cooperating with law enforcement due to a pending criminal investigation into possible violations of state of Ohio drug laws. Although no promises have been made to CI-1, CI-1 is motivated to cooperate with law enforcement in hopes of consideration during the prosecution of his/her criminal case. CI-1 has never provided materially false information.

PAYNE at the **TARGET CELL PHONE** [3] in recorded text messages and phone calls. During a recorded call, PAYNE agreed to sell the UC methamphetamine and fentanyl at whatever price the UC had paid to past drug dealers. Shortly after the call, the UC sent PAYNE a text asking, "u good with 1700 for both," referring to $1,700 total for eight ounces of methamphetamine and half an ounce of fentanyl. PAYNE texted back agreeing to the $1,700 purchase price for that quantity of drugs.

12.     On February 1, 2023, at approximately 2:30 p.m., agents and officers established surveillance near 4056 Prescott Avenue. Agents observed a black Jeep Cherokee, bearing Ohio license plate JJY9189[4] (the "black Jeep Cherokee"), parked in the driveway of the residence. Agents know, based on past physical and electronic observations of PAYNE, that PAYNE uses the black Jeep Cherokee.

13.     On February 1, 2023, beginning at approximately 3:00 p.m., the UC and PAYNE exchanged several recorded telephone calls and text messages in which PAYNE, using the **TARGET CELL PHONE**, directed the UC to 4060 Prescott Avenue, a residence located directly next to 4056 Prescott Avenue.

14.     On February 1, 2023, at approximately 4:15 p.m., the UC, as observed by surveillance agents, pulled into the driveway of 4060 Prescott Avenue. The UC then placed a recorded telephone call to PAYNE at the **TARGET CELL PHONE**. The UC told PAYNE that the UC was in the driveway of what looked like an abandoned house. PAYNE explained to the UC that he (PAYNE) "has everyone come there to keep everyone safe." Based on my training

---

[3] All of PAYNE's communications with the UC, including text messages and calls, were placed either to or from the **TARGET CELL PHONE**. PAYNE never used any other phone number to contact the UC.

[4] Ohio license plate JJY9189 is registered to a 2018 Jeep Grand Cherokee, with a registered owner of M.S. residing at 4095 Redonda Lane, Dayton, Ohio. At this time, there is no known connection between M.S. and PAYNE.

and experience, I believe that PAYNE provided the UC with an address that was not a primary residence associated with PAYNE in an effort to attempt to detect law enforcement involvement in a controlled drug purchase, and/or to assess whether the UC intended to rob PAYNE. By sending the UC (or any drug purchaser) to a neighboring residence, PAYNE can observe the individual and assess his or her intentions before making contact in order to—as PAYNE put it— "keep everyone safe."

15.     After explaining why he directed the UC to an abandoned house, PAYNE then told the UC to come to the driveway next to the Jeep. The UC then moved the UC vehicle to the driveway of 4056 Prescott Avenue and parked next to the black Jeep Cherokee. PAYNE then directed the UC to come inside 4056 Prescott Avenue. The UC exited the UC vehicle and walked towards the side of 4056 Prescott Avenue, where the UC observed PAYNE in the side yard, motioning for the UC to walk over to him.

16.     The UC proceeded to walk to the backyard of 4056 Prescott Avenue where PAYNE was standing. PAYNE and the UC then entered 4056 Prescott Avenue through the back door. Once inside, the UC saw an unidentified man sitting at a table. On the table, the UC observed a large number of bags containing what appeared to be processed marijuana; clear bags containing a clear crystal-like substance the UC recognized as methamphetamine; and a large bag containing a hard cream-colored substance the UC recognized as fentanyl. Additionally, the UC saw large stacks of United States currency at the end of the table.

17.     PAYNE then broke off a half ounce of fentanyl from the large bag on the table containing the hard cream-colored substance. PAYNE had a scale next to the large bag and used it to weigh the fentanyl. After weighing it, PAYNE put the fentanyl in a clear bag. PAYNE, who had already placed a half pound of methamphetamine in a different clear bag, handed the

UC both bags. After receiving the bags, the UC handed PAYNE $1,700 of pre-recorded confidential funds, which PAYNE counted. After counting the money, PAYNE accompanied the UC out the back door of 4056 Prescott Avenue and walked with the UC to the driveway where the UC's vehicle was parked. While they walked to the UC's vehicle, PAYNE told the UC that he (PAYNE) wanted to do good business and explained that at 4056 Prescott Avenue PAYNE is surrounded by "his people" and that PAYNE "controls things on the block." The UC then got into the UC vehicle and departed the area.

18.     Following the controlled purchase, a BCI special agent field tested the substances using a MX908 testing device. The bag containing a half pound of a clear crystal-like substance (total package weight 226.2 grams) tested positive for methamphetamine, a Schedule II controlled substance. The smaller bag containing a cream-colored powder (total package weight of 14 grams) tested positive for fentanyl, a Schedule II controlled substance, and diphenhydramine.[5] Agents sent the purchased substances to a laboratory for forensic analysis; as of the date of this affidavit, the laboratory results are still pending.

**ii.     PAYNE sold drugs to an undercover agent on February 8, 2023.**

19.     On February 8, 2023, the UC purchased eight ounces of methamphetamine and one ounce of fentanyl from PAYNE for $2,300 at 4056 Prescott Avenue. The UC arranged the drug transaction by contacting PAYNE at the **TARGET CELL PHONE** in recorded text messages and phone calls.

---

[5] Diphenhydramine is not a scheduled substance. Based on my training and experience, I know that drug traffickers frequently dilute controlled substances with other substances—known as "cut"—to increase the quantity of drugs, and thereby increase their profits.

20.     On February 8, 2023, at approximately 12:19 p.m., agents and officers established surveillance in the area of the 4056 Prescott Avenue. Agents observed PAYNE's black Jeep Cherokee parked in the driveway of the residence.

21.     Approximately one hour later, around 1:15 p.m., the UC placed a recorded telephone call to PAYNE at the **TARGET CELL PHONE**.  During the call, PAYNE directed the UC to 4056 Prescott Avenue.  At approximately 1:23 p.m., the UC, as observed by surveillance agents, pulled into the driveway of 4056 Prescott Avenue.  The UC noted that PAYNE's black Jeep Cherokee was no longer in the driveway of the residence; instead, a gray Honda sedan was backed into the driveway.  As the UC started to exit the UC vehicle, PAYNE walked out of the front door of 4056 Prescott Avenue.  The UC observed a large bulge and a paper towel sticking out of the pocket of PAYNE's sweatshirt.  PAYNE entered the front passenger's seat of the UC vehicle.  PAYNE told the UC that he put two different kinds of fentanyl in the bag for the UC.  PAYNE then removed from the front pocket of his sweatshirt a paper towel containing two plastic bags.  One bag contained two separate plastic bags of fentanyl (total package weight of 31.1 grams). The second bag contained methamphetamine (total package weight of 232.5 grams). PAYNE put the paper towel-wrapped bags in the middle console of the UC vehicle.  The UC then handed PAYNE $2,300 of pre-recorded confidential funds.

22.     After PAYNE accepted the $2,300 from the UC as payment for the drugs, PAYNE told the UC that he (PAYNE) had vehicles similar to the UC vehicle and that the UC needed to be careful where the UC stored drugs in the vehicle.  PAYNE then then got out of the UC vehicle, kneeled on one knee, reached into the vehicle to put his arm around the center

console, and hid the drugs in a void near the firewall of the vehicle. PAYNE then walked back to 4056 Prescott Avenue and entered through the front door. The UC then departed the area..

23.     A BCI special agent field tested the substances purchased from PAYNE using a MX908 testing device. The largest of the bags contained a half pound of a clear crystal-like substance that tested positive for methamphetamine, a Schedule II controlled substance. The two smaller bags contained a total of approximately 28 grams of a cream-colored powder that tested positive for fentanyl, a Schedule II controlled substance, as well as diphenhydramine and caffeine.[6] Agents sent the purchased substances to a laboratory for forensic analysis; as of the date of this affidavit, the laboratory results are still pending.

**D. The evidence suggests that PAYNE continues to use the TARGET CELL PHONE to traffic drugs.**

24.     Since the UC's controlled purchases on February 1, 2023, and February 8, 2023, PAYNE, using the **TARGET CELL PHONE**, has continued to communicate with the UC. For example, PAYNE, using the **TARGET CELL PHONE**, has exchanged several text messages and telephone calls with the UC to discuss additional purchases of methamphetamine and fentanyl. The most recent exchange between PAYNE and the UC occurred on Wednesday, February 22, 2023.

25.     Based on the foregoing, I believe that PAYNE continues to actively traffic drugs in the greater Dayton, Ohio area, and that he uses the **TARGET CELL PHONE** to contact buyers and arrange drug transactions.

//

//

---

[6] Diphenhydramine and caffeine are not scheduled substances. Based on my training and experience, I know that drug traffickers frequently dilute controlled substances with other substances—known as "cut"—to increase the quantity of drugs, and thereby increase their profits.

**E. I believe that tracking the TARGET CELL PHONE's location will provide evidence relevant to my investigation into PAYNE's drug trafficking crimes.**

15.    Based on the facts set forth in this affidavit, there is probable cause to believe that

PAYNE uses the **TARGET CELL PHONE** to facilitate his drug trafficking activities. Based on

my training and experience, I know that individuals typically carry cell phones on their person or

keep their cell phones nearby; therefore, I believe that the information sought by this warrant will

help the investigative team monitor the location of the **TARGET CELL PHONE**, thus PAYNE,

and determine the location and transportation method of drug shipments as part of the investigation

into the Subject Offense**s** conducted by PAYNE and co-conspirators.

16.    According to a review of AT&T Corporation account details for the **TARGET**

**CELL PHONE**, the cellular telephone is a prepaid phone with no subscriber data. In my training

and experience, drug dealers routinely obtain cellular telephone services in fictitious names and

addresses, or fail to provide any names or addresses at all, in an effort to avoid law enforcement

detection.  The facts learned to date in this investigation and set forth herein lead me to believe

that the **TARGET CELL PHONE** is being used to facilitate illegal narcotics trafficking in

violation of Title 21 of the United States Code.

17.    In my training and experience, I have learned that AT&T Corporation is a company

that provides cellular telephone access to the general public.  I also know that providers of cellular

telephone service have technical capabilities that allow them to collect and generate information

about the locations of the cellular telephones to which they provide service, including E-911 Phase

II data, also known as GPS data or latitude-longitude data and cell-site data, also known as

"tower/face information" or cell tower/sector records**.**  E-911 Phase II data provides relatively

precise location information about the cellular telephone itself, either via GPS tracking technology

built into the phone or by triangulating on the device's signal using data from several of the

provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

18.     Based on my training and experience, I know that AT&T Corporation can collect E-911 Phase II data about the location of the **TARGET CELL PHONE**, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on AT&T Corporation's network or with such other reference points as may be reasonably available.

19.     Based on my training and experience, I know that AT&T Corporation can collect cell-site data about the **TARGET CELL PHONE**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as AT&T Corporation typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## BACKGROUND ON DRUG TRAFFICKERS

20.     Based on my training and experience, as well as my discussions with other law enforcement agents, I know the following are common practices of drug dealers:

i.    Drug dealers commonly store drugs and drug paraphernalia, including pipes, syringes, and rolling papers, in their residences, stash houses, and/or vehicles in order to have ready access to the drugs and/or paraphernalia in order to conduct their drug dealing business or to use those drugs personally;

ii.    Drug dealers attempt to mask the distinct odors of particular drugs through the use of heat sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease;

iii.    Drug dealers often dilute, or "cut," drugs in order to maximize the volume of drugs they have to sell, and thus their profits. Drug dealers use various substances to dilute drugs, including mannitol, mannite, lactose, Vitamin B12, and MSM. Drug dealers use equipment, such as scales, sifters, hammers, grinders, razor blades, glass panes, mirrors and kilo or pound presses as part of the dilution or "cutting" process. Once the drug has been "cut," drug dealers usually will repackage it, often in smaller quantities, using masking agents, tape, heat sealers and heat sealed bags, ziplocs bags, paper bindles, and/or other containers for redistribution. It is common for drug dealers to maintain such equipment and supplies in their residences and stash houses;

iv.    Drug dealers keep books, receipts, notes, ledgers and other forms of records specifically relating to their drug distribution activities. Because drug dealers often "front" drugs to their customers – that is, sell the drugs on credit – or receive drugs from their suppliers on credit, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and suppliers. These ledgers are more commonly known as "pay/owe sheets" and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets, and are frequently encoded in order to protect those involved. Drug dealers often keep such records on their person or in their residences, stash houses, and/or vehicles;

v.    Drug dealing is a cash business. Customers pay for drugs with cash and dealers commonly purchase drugs from their suppliers with cash. Drug dealers commonly keep large sums of currency, financial instruments, precious metals, jewelry, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances. When drug dealers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement. To accomplish this, drug dealers often use different techniques, including the use of foreign and domestic banks and their attendant services, including savings and checking accounts, securities,

cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source. Drug dealers also purchase real estate or vehicles, and establish shell corporations and business fronts that they use to launder drug proceeds. Drug dealers often utilize fictitious or "straw-holder" owners to conceal the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug sales. In addition, drug dealers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business. Drug dealers often keep these items of value, and records relating to them, on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available.

vi.    Drug dealers go to great lengths to hide and secure the drugs, drug proceeds, other items of value and records relating to their drug business. This is to safeguard those items against robbery and keep them from law enforcement. These secure locations typically include safes, vaults, or other locked containers, as well as specially constructed concealed compartments such as those often found in vehicles used specifically to facilitate drug dealing. Other methods of concealment include the burial of such items underground, the use of locked vehicles, trailers, out buildings, sheds, and/or exterior closets, the use of natural spaces within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning machines;

vii.    Drug dealers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written airbills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement. Drug dealers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash houses, and/or in their vehicles where they are available for reference.

viii.    Drug dealing is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package and deliver the drugs and persons to launder the drug

proceeds. These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained on their person or in their residences, stash houses, and/or vehicles, so they are readily available in order to efficiently conduct their drug dealing business. Moreover, such records are often stored electronically within the memory of telephones, computers, and/or personal digital assistants such as iPhone and Blackberry devices;

ix.   Drug dealers often use cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. Drug dealers often keep these items on their person or in their residences, stash houses, businesses, and/or vehicles where they are readily available;

x.   Drug dealers often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, or to transport drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug dealers in their residences, stash houses, and/or vehicles where they are readily available for use or reference;

xi.   Drug dealers frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take such items and/or harm them during transactions. Such weapons, which are often stolen or otherwise possessed illegally, are typically maintained on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available;

xii.   Drug dealers often utilize two-way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement, and that such items are typically maintained at their residences, stash houses, and/or in their vehicles.

xiii.    Drug dealers frequently take, or cause to be taken, photographs and/or videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs; and such items are often stored on their person, in their residences, and/or vehicles;

xiv.    During the course of a search it is not uncommon to find items of personal property that tend to identify the person(s) in residence occupancy, control, or ownership of the place being searched vehicle, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, immigration documentation, birth certificates, and keys;

xv.    I know that drug dealers often use their vehicles to transport contraband – including drugs, drug proceeds and firearms – and other evidence of their activities.   I know that following a drug trafficker's movements can facilitate surveillance and enable agents to follow a subject without exposing themselves to the subject they are following.   This in turn enables agents to observe a drug trafficker's meetings with other associates and learn about new locations where a DTO stores drugs, money, firearms and other items related to the manufacture and distribution of controlled substances.

## AUTHORIZATION REQUEST

21.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

22.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the **TARGET CELL PHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified

in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

23. I further request that the Court direct AT&T Corporation to disclose to the government any information described in Attachment B that is within the possession, custody, or control of AT&T Corporation. I also request that the Court direct AT&T Corporation to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T Corporation's services, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on AT&T Corporation's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate AT&T Corporation for reasonable expenses incurred in furnishing such facilities or assistance.

24. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **TARGET CELL PHONE** outside of daytime hours.

//

//

//

//

25.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Rebecca L. S. DeBord
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on February 23rd, 2023.
By reliable electronic means (telephone)

Caroline H. Gentry
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

1.     The cellular telephone assigned call number **(404) 386-7603** (the "**TARGET CELL PHONE**"), whose service provider is AT&T Corporation, a wireless telephone service provider headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida, 33408.

2.     Records and information associated with the **TARGET CELL PHONE** that is within the possession, custody, or control of AT&T Corporation, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

### I. Information to be Disclosed by the Provider

All information about the location of the **TARGET CELL PHONE** described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the **TARGET CELL PHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T Corporation, AT&T Corporation is required to disclose the Location Information to the government. In addition, AT&T Corporation must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T Corporation's services, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on AT&T Corporation's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T Corporation for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.     Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846 involving PAYNE and possibly other unidentified subject(s).